Case 3:26-mj-01164-PDB    Document 1    Filed 04/13/26    Page 1 of 16 PageID 1

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

| | | |
|---|---|---|
| United States of America<br>v.<br><br>HAI VINH LAM<br>a/k/a Tony Lam<br><br>XING TIAN | ) ) ) ) ) ) ) | Case No.<br><br>3:26-mj-1164-PDB |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   February 2, 2026  - April 11, 2026   in the county of           Clay           in the

      Middle      District of        Florida        , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to commit marriage fraud |
| 8 U.S.C. § 1325(c) | Marriage Fraud |

This criminal complaint is based on these facts:

See Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Ryan P. McEnany, Special Agent HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  4/13/2026

_____
*Judge's signature*

City and state:          Jacksonville, FL          

Patricia D. Barksdale, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT

I, Ryan McEnany, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws.

2.      The information contained in this affidavit is based upon my personal knowledge derived from my participation in this investigation, my review of reports on matters related to this investigation, and the review of information and statements made to me by members of the Naval Criminal Investigative Service (NCIS), the Army Criminal Investigative Division (Army CID), and Army Counterintelligence (Army CI).   I make this affidavit in support of an application for the issuance of a criminal complaint for Hai Vinh "Tony" LAM, hereinafter "LAM," and Xing TIAN, hereinafter "TIAN," for violations of 8 U.S.C. § 1325(c) (marriage fraud) and 18 U.S.C. § 371 (conspiracy).  This affidavit does not include all facts and evidence known to me, but rather contains facts and evidence sufficient to support the issuance of a criminal complaint.

3.      I was hired by Homeland Security Investigations (HSI) as a Special Agent in September 2004. As part of my training, I attended a 22-week training academy at the Federal Law Enforcement Training Center in Glynco, GA, which included numerous facets of performing federal criminal investigations.

4.     As an HSI agent, I have conducted several investigations involving: (1) the unlawful importation, exportation, manufacture, possession with intent to distribute and distribution of narcotics; (2) the illegal importation of intellectual property rights (IPR) commodities; (3) the laundering of narcotics proceeds and ill-gotten gains, and other financial investigations; (4) conspiracies associated with narcotics-related offenses; (5) the unlawful importation and exportation of firearms and firearm parts; and (6) exportation of Personal Identification Information (PII), other sensitive information, and licensable commodities related to national security investigations. These investigations in various areas of criminal law have involved debriefing defendants, witnesses, and informants; conducting surveillance, including court ordered Title III interceptions (electronic surveillance); executing search warrants; seizing assets; and making arrests for violations of federal criminal offenses. I am currently assigned to the HSI Jacksonville, Florida, National Security Group (NSG), and I am a task force officer (TFO) with the Federal Bureau of Investigation (FBI) Counterintelligence Task Force (CITF). The primary mission of the HSI Jacksonville NSG is to investigate individuals and groups engaged in the commission of federal crimes in the Middle District of Florida to include, but not limited to, import/export violations, immigration violations, and economic crimes as they relate to national security.

2

## Overview of Investigation

5.      This investigation began in January 2025 when law enforcement received information from a confidential source (CS-1) regarding Raymond ZUMBA attempting to bribe CS-1 and CS-1's spouse (CS-2), a U.S. Navy employee, to create unauthorized Department of Defense (DoD) military identification cards for Kin Man "Bruce" CHOEK, a Chinese citizen, and Anny CHEN, a naturalized U.S. citizen originally from China. The "Common Access Card," commonly known as a "CAC" or "CAC Card," is a smart card that serves as a standard form of legal identification issued by the DoD. The CAC is the standard legal identification for active-duty uniformed service personnel, selected reserve personnel, DoD civilian employees, and eligible contractor personnel. It allows eligible individuals to access DoD facilities. Other individuals, such as dependent family members or foreign affiliate military personnel, are not eligible to receive CACs, but rather can obtain a different type of legal identification known as the Uniformed Services ID Card ("USID"), which also allow entrance into DoD facilities.[1]

6.      In addition to soliciting CS-1 and CS-2 to create unauthorized USIDs in exchange for an under-the-table payment, ZUMBA also solicited them to marry Chinese nationals. ZUMBA stated during recorded calls and meetings that CS-1 and CS-2 could each earn $35,000 total for marrying a Chinese national, helping them

---

[1]      See "Next Generation Uniformed Services ID Card," available at https://www.cac.mil/Next-Generation-Uniformed-Services-ID-Card/.

obtain a green card, and then divorcing them. On February 14, 2025, other agents and I conducted a buy/bust operation in Jacksonville, Florida, after ZUMBA traveled with CHEN, CHEOK, and a third individual, Hailing "Helen" FENG, from New York to Jacksonville to obtain the unauthorized USIDs. During post-Miranda interviews, CHEN and FENG gave consent to search their cellular phones.

7.    ZUMBA subsequently pleaded guilty to bribery of a public official (Case No. 3:25-cr-44-HES-MCR) and conspiracy to commit marriage fraud (Case No. 3:25-cr-247-HES-LLL) in the United States District Court for the Middle District of Florida. Several other conspirators have also pleaded guilty in the same court to conspiracy to commit marriage fraud: Brinio URENA (Case No. 3:25-cr-173-HES-PDB); Morgan CHAMBERS (Case No. 3:25-cr-261-HES-PDB); and Jacinth BAILEY (Case No. 3:25-cr-262-HES-PDB).

8.    On January 28, 2026, a federal grand jury in the Middle District of Florida returned an Indictment in Case No. 3:26-cr-15-HES-PDB, which charged CHEN, FENG, and CHEOK with conspiracy to commit marriage fraud and conspiracy to bribe a public official, and eight other individuals with conspiracy to commit marriage fraud.

## PROBABLE CAUSE

9.    As part of the investigation described above, in reviewing messages and photographs on cellular devices, investigators identified a U.S. Army soldier stationed at Fort Campbell, Kentucky, who appeared to have engaged in a sham marriage with a Chinese national. On January 21, 2026, I traveled to Fort Campbell

4

to interview the soldier (hereinafter identified as CS-3). I, in partnership with Army Counterintelligence (Army CI) SA Danny Gomez, and Naval Criminal Investigative Service (NCIS) SA Conner Hayden, interviewed CS-3 at the Army Criminal Investigative Department (Army CID) office on Fort Campbell. Prior to interviewing CS-3, SA Gomez advised CS-3 of CS-3's rights as required by Army CID policy, and CS-3 agreed to speak with us without an attorney present. CS-3 admitted to engaging in marriage fraud and marrying a Chinese citizen for profit and for the purpose of obtaining U.S. immigration benefits for the Chinese citizen. CS-3 described how he was recruited into the conspiracy by another soldier stationed at Fort Campbell (hereinafter identified as Conspirator-A). According to CS-3, Conspirator-A instructed the CS to contact "Tony," who CS-3 believed to be based in New York, for further instructions regarding the sham marriage process. Our investigation has positively identified "Tony" as LAM, a Vietnamese-born naturalized U.S. citizen. Conspirator-A provided CS-3 with a telephone number for "Tony" ending in -7660. CS-3 believed Conspirator-A also provided LAM with CS-3's telephone number.

10.    CS-3 stated that CS-3 contacted LAM via text messages and telephone calls. During the text messages and telephone calls, LAM explained the process of the marriage scheme and the payment schedule which was $10,000 for the marriage and $10,000 for the "green card." Upon CS-3 marrying his Chinese spouse, LAM paid CS-3 $10,000 in cash and gave CS-3 an additional $2,000 to pay Conspirator-A. Based on this investigation, I believe the $2,000 payment to Conspirator-A was a

"finder fee" and payment for Conspirator-A's recruitment of CS-3 to engage in the marriage fraud scheme. Further, CS-3 stated LAM instructed CS-3 to apply for a USID card for CS-3's Chinese citizen spouse, and CS-3 successfully obtained the USID for the spouse. At the time of the interview detailed above, CS-3 showed me recent text messages from LAM to CS-3 informing CS-3 that the spouse's USID was expiring and needed to be renewed. LAM continued to message CS-3 to ensure the renewal was scheduled. Ultimately, due to our involvement, CS-3 has not renewed the USID.

11.     LAM continued to press CS-3 about recruiting other servicemembers to participate in the marriage fraud scheme and offered CS-3 a $2,000 "finder fee," but CS-3 stated CS-3 had not attempted to recruit anyone. At my direction, CS-3 contacted LAM and stated that CS-3 had begun to recruit someone for the organization, and asked LAM if he preferred a man or woman. LAM replied that it did not matter as long as they were in the military. Again, at my direction and as similarly described above, CS-3 provided the name and phone number of an Army CID undercover agent posing as a female U.S. Army soldier (hereinafter identified as UC-1) to LAM, and provided UC-1 with LAM's contact information.

12.     On or about February 2, 2026, at approximately 7:30 p.m., UC-1 placed a recorded phone call to LAM at the telephone number ending in -7660. LAM answered the call and identified himself as "Tony." LAM questioned UC-1 about the military base at which she was stationed, and if she had been married before. UC-1 informed LAM she was in the U.S. Army, currently stationed at Camp

Blanding, in the Middle District of Florida, and had never been married. UC-1 asked LAM to explain the process and informed LAM that CS-3 had described the scheme as a "fake marriage." LAM explained the scheme helps Asian people and their parents and described it as an investment in their future. LAM explained he works with a lot of soldiers from Tennessee.

13. LAM stated if UC-1 decided to participate, UC-1 would be required to travel to New York to get married and would need to provide LAM with the following documents: driver's license; birth certificate; military ID (CAC); social security card; W2 forms for 2023, 2024, and 2025; two pictures in civilian clothes; and two pictures in her Army uniform. LAM said UC-1 would be paid approximately $35,000 in three payments. The first payment would be on the day of the marriage in cash. UC-1 provided LAM with the photographs and documents requested above in her cover identity.

14. On or about February 5, 2026, at approximately 11:16 a.m., UC-1 placed a recorded call to LAM. During the conversation, LAM informed UC-1 the "office" had found a spouse for her if she wanted to continue, and UC-1 concurred. Following this call, UC-1 and LAM had regular contact via text and recorded phone calls wherein they discussed UC-1 traveling to New York to marry the Chinese citizen. Ultimately, LAM provided a photograph of an Asian male—later identified as TIAN, a Chinese citizen illegally present in the U.S.—as UC-1's sham marriage spouse.

7

15.     At my direction, on or about March 6, 2026, at approximately 11:08 a.m., UC-1 placed a recorded call to LAM.  During the conversation and using a ruse, UC-1 stated she was unable to travel to New York to marry TIAN because she was on a 24-hour recall and unable to travel more than 200 miles from base due to the Iran conflict.  UC-1 then offered the option of LAM and TIAN traveling to Jacksonville, Florida to get married.  LAM explained he would have to confer with the "office" and get back with UC-1.  Later that day, LAM texted UC-1 and requested a call.  UC-1 placed a recorded phone call to LAM and LAM inquired about the requirements to obtain a marriage license in Florida.  UC-1 informed LAM she would research the requirements and provide LAM with the details.

16.     Following regular contact with LAM, on or about March 23, 2026, LAM texted UC-1 and informed her that he and TIAN had booked flights to travel from New York to Jacksonville on April 9, 2026.  Further, LAM informed UC-1 he was traveling to Fiji and Hong Kong, China on March 24, 2026, and was scheduled to return to New York on April 8, 2026.

17.     On March 26, 2026, UC-1 received a text message from LAM from another telephone number ending in -9198. UC-1 then placed a recorded call to LAM at that number.  During the call, LAM stated he was in Fiji and then traveling to Hong Kong.  LAM explained that his other phone doesn't work so he is utilizing the new phone.

18.     On March 27, 2026, LAM texted UC-1 a photograph of a New York State Identification Card bearing the name Hai Vinh LAM with a photograph of

8

LAM depicted on the card. I sent a picture of the photograph to CS-3, who positively identified LAM as "TONY." Additionally, LAM sent a photograph of a TD Bank Debit/Visa card bearing LAM's name and instructed UC-1 to make a hotel reservation for one room at a hotel located on Town Center Parkway in Jacksonville. UC-1 reserved one room with two beds for LAM and TIAN from April 9 to April 12, 2026. LAM also instructed UC-1 to reserve the gazebo at Spring Park in Green Cove Springs, Florida, for the wedding ceremony. UC-1 did reserve the gazebo. LAM also instructed UC-1 to obtain a photographer and officiant for the wedding ceremony. Investigators arranged for an HSI undercover agent to pose as the photographer (hereinafter identified as UC-2) and another HSI undercover agent to pose as the wedding officiant (hereinafter referred to as UC-3).

19.    Further, LAM texted a photograph of a screenshot of an appointment for a marriage license at the Clay County Clerk and Comptroller scheduled for April 10, 2026, at 10:00 a.m. On April 2, 2026, I contacted the Clay County Clerk and Comptroller's office, and they provided me with the details of the above-referenced appointment. According to their records, Xing TIAN, listed at a particular address in Flushing, NY, was listed as the groom, and UC-1 was listed as the bride.

20.    On April 7, 2026, LAM texted UC-1 a photograph of a "Cathay Pacific" airline ticket with the name "Hai Vinh LAM" dated April 8, 2026, showing a departure time of 02:25 and departing Hong Kong arriving at JFK Airport in New York. I queried DHS databases and discovered LAM traveled to Fiji on March 24,

2026, with another U.S. citizen, and had a return flight from Hong Kong, China to New York on April 8, 2026.

21.    On April 10, 2026, at approximately 8:00 a.m., Internal Revenue Service (IRS) SA and HSI Task Force Agent (TFA) Jeff Shouse observed LAM and TIAN arrive at the Spring Park Coffee shop located at 328 Ferris St, Green Cove Springs, Florida 32043. SA Shouse observed LAM and TIAN enter the coffee shop and meet with UC-1 and UC-2. For the purpose of this operation, UC-1, UC-2, and UC-3 were equipped with audio and video recording devices as well as transmitters for real-time observations. During this meeting, I listened to the real-time transmissions as LAM introduced UC-1 to her soon-to-be husband, TIAN. UC-1 later informed me that TIAN appeared to understand some English, but spoke very little English. While UC-1 and TIAN acquainted themselves, LAM inquired about the marriage status of UC-2. Ultimately, LAM propositioned UC-2 about her interest in traveling to New York to marry a Chinese citizen for profit and UC-2 concurred. At approximately 9:00 a.m., agents observed LAM, TIAN, UC-1, and UC-2 exit the coffee shop and enter UC-2's vehicle. Agents then observed UC-2 drive them all to the Clay County Clerk and Comptroller's office in Green Cove Springs in the Middle District of Florida.

22.    At approximately 9:19 a.m., HSI SA Nick Carlo observed UC-1 and TIAN enter the clerk's office. Meanwhile, UC-2 and LAM remained in the vehicle. LAM then placed a phone call to the "office," and upon conclusion of the phone call

10

LAM informed UC-2 that the "office" had found a husband for her. LAM then instructed UC-2 she needed to provide LAM with three photographs of herself.

23.     At approximately 9:42 a.m., SA Carlo observed UC-1 and TIAN exit the courthouse and enter the vehicle already occupied by UC-2 and LAM. UC-1 then informed LAM they had successfully obtained a marriage license. UC-1 later informed me that TIAN utilized an application on his telephone to translate the questions and answers required to obtain a marriage license. Agents observed UC-2 drive the occupants to Spring Park, where UC-1 and TIAN changed into their wedding attire at the Spring Park bathrooms.

24.     At approximately 9:52 a.m., UC-1, TIAN, UC-2, LAM, and UC-3 participated in the sham wedding ceremony. UC-2 photographed the ceremony while UC-3 officiated. At approximately 10:00 a.m., UC-1 and TIAN had confirmed their intent to marry each other and the ceremony was complete. At the conclusion of the ceremony, LAM paid UC-3 $200 cash and UC-2 $500 cash for their services.

25.     UC-2 then took staged photographs of UC-1 and TIAN. Following the photographs, UC-1 and TIAN changed out of their wedding attire, entered UC-2's vehicle, and departed Spring Park destined for a Bank of America branch location on Baymeadows Road in Jacksonville, while agents followed. At approximately 11:02 a.m., SA Shouse observed UC-2's vehicle arrive at the Bank of America. HSI SA John O'Keefe observed UC-1, TIAN, and LAM exit the vehicle and enter the bank.

11

26.    LAM had previously informed UC-1 that his "office" insisted UC-1 and TIAN open a joint bank account following their marriage, which was the purpose of stopping at Bank of America.  UC-1 and TIAN successfully opened a joint bank account, and UC-1 informed me that TIAN withdrew $15,000 cash from a business account and transferred an additional $1,500 from the same business account into the newly established joint bank account.  According to LAM, the money located in the joint bank account would be utilized to pay for immigration fees associated with applications to U.S. Citizenship and Immigration Service (USCIS) for TIAN's adjustment of status.

27.    At approximately 12:02 p.m., SA O'Keefe observed UC-2's vehicle depart Bank of America and drive to a restaurant on Big Island Drive in Jacksonville.  At approximately 12:20 p.m., NCIS SA and HSI TFA Conner Hayden observed UC-1, TIAN, UC-2, and LAM enter the restaurant.  According to UC-1, upon entering the restaurant, LAM handed her the $15,000 cash that had been withdrawn at the Bank of America.  UC-1, TIAN, UC-2, and LAM had a celebratory meal at the restaurant, paid for by TIAN.  At approximately 1:25 p.m., I observed UC-1, TIAN, UC-2, and LAM depart the restaurant, enter UC-2's vehicle, and depart for their hotel.  Shortly thereafter, SA O'Keefe observed them arrive at the hotel where TIAN and LAM exited the vehicle and entered the lobby of the hotel.

28.    In earlier calls and messages, UC-1 had confirmed with LAM that a photo shoot would take place with UC-1 and TIAN on April 11, 2026, at 10:30 a.m.,

12

at a museum located on Riverside Avenue in Jacksonville.  On that day, SA O'Keefe and SA Will Sanford began surveillance at the hotel.  At approximately 10:23 a.m., SA O'Keefe observed TIAN and LAM enter a vehicle believed to be a rideshare and depart the hotel.  At approximately 10:30 a.m., a Florida Highway Patrol (FHP) Officer conducted a traffic stop of the rideshare on St. Johns Bluff Road S in Jacksonville.  SAs O'Keefe and Sanford assisted FHP.  SA O'Keefe confirmed TIAN was present in the vehicle and took TIAN into custody for administrative immigration violations.  SAs O'Keefe and Sanford transported TIAN to the HSI Jacksonville office.

29.    At that time, I arrived at the traffic stop and asked LAM to exit the rideshare and enter my vehicle.  LAM was compliant, and I proceeded to explain to LAM the details of our investigation without questioning him.  I asked LAM if he would be willing to give consent to search his hotel room, and LAM consented, signing a consent to search form providing agents authorization to search the hotel room.  Meanwhile, utilizing a Lionbridge language line translator speaking in TIAN's native language of Mandarin, SA O'Keefe requested consent to search the above hotel room from TIAN, as he and LAM were sharing the room.  TIAN provided verbal consent to search the hotel room.  Agents located the key to the hotel room among TIAN's possessions, and utilized the key to access the room.  Ultimately, agents sized a laptop computer belonging to TIAN and documents including detailed instructions on how to commit marriage fraud typed in English and Chinese belonging to LAM.

30.    I transported LAM to the HSI Jacksonville office, where I confirmed with LAM that he is fluent in English both speaking and reading. I advised LAM of his constitutional rights in English, and he consented to be interviewed and signed a waiver form. SA Hayden and Army CID SA Scott Conroy were present with me as we questioned LAM. LAM confirmed he traveled from New York to Jacksonville for the purpose of assisting TIAN in marrying UC-1 to gain immigration benefits for TIAN. LAM stated he was expecting to be paid $4,000 for the marriage by one of his co-conspirators, Conspirator-B, upon his return to New York.

31.    I also interviewed TIAN utilizing the Lionbridge language line. I advised TIAN of his constitutional rights in Mandarin via the translator, and he consented to be interviewed and signed a waiver form. TIAN explained he had received a flyer in New York where he lived, advertising the marriage fraud organization. TIAN contacted Conspirator-B to enter into a sham marriage, and paid Conspirator-B approximately $35,000 cash to arrange the marriage with UC-1, which would ultimately result in TIAN obtaining a "green card." TIAN then withdrew $15,000 cash from his account on April 10, which was the $15,000 paid to UC-1 as detailed above. TIAN also stated the purpose of marrying UC-1 was to get a "green card." Lastly, TIAN stated he would be required to pay Conspirator-B an additional $10,000 cash upon receiving his "green card."

14

32.    Based upon the foregoing, there is probable cause to believe that Hai Vinh "Tony" LAM and Xing TIAN have committed violations of 8 U.S.C. § 1325(c) (marriage fraud) and 18 U.S.C. § 371 (conspiracy).


_____
Ryan McEnany
Special Agent
Homeland Security Investigations


Subscribed and sworn to before me on April 13th, 2026, at Jacksonville, Florida.

_____
PATRICIA D. BARKSDALE
UNITED STATES MAGISTRATE JUDGE

15